[No. A050612. First Dist., Div. Three. Dec. 27, 1991.]

MICHAEL J. CARBONI, Plaintiff and Appellant, v.
JORGE ARROSPIDE, SR., Defendant and Respondent.

**COUNSEL**

Carr, McClellan, Ingersoll, Thompson & Horn and David M. McKim for Plaintiff and Appellant.

Jorge Arrospide, Sr., in pro. per. for Defendant and Respondent.

**OPINION**

**WHITE, P. J.**—In this case we consider whether a secured note providing for interest at a rate of 200 percent per annum is unconscionable. In the circumstances presented here, we conclude that it is.

I

FACTS

The evidence at trial established that on July 27, 1988, George Arrospide, Jr., signed a $4,000 note and deed of trust on behalf of his father, Jorge Arrospide, Sr., as his attorney in fact. The note was made in favor of Michael Carboni, a licensed real estate broker. It carried an interest rate of 200 percent per annum, was due in three months, and was secured by a fourth deed of trust on a residence owned by Jorge Sr. located at 36 Alexander in Daly City. The loan documents indicate the security had a value of $250,000 with existing encumbrances of $193,000.

The parties originally intended the note would be paid off in a single lump sum payment of $6,000 after three months. However, over the next four months, Carboni continued to make cash advances to Jorge Sr. which were secured by the original note and deed of trust. By November 25, 1988, the principal amount of the note had ballooned to $99,346, all of which was carried at an interest rate of 200 percent per annum. At the time of trial in March of 1990, the principal and accumulated interest amounted to nearly $390,000.

The testimony was sharply divided concerning the purpose for the loan. Carboni testified that the money was advanced directly to George Jr. to be used to refurbish residential property which he intended to resell at a profit. The Arrospides, on the other hand, claimed the money was used for Jorge Sr.'s "personal obligations"—primarily to pay medical expenses for his ailing parents who lived in Peru. George Jr. testified that his father was under "emotional duress" because of these personal obligations, and that he obtained the loan at his father's specific instruction.

The Arrospides also claimed the parties agreed not to secure the note, or, at least, not to record the deed of trust which George Jr. had executed. The

purported reason for this condition was that there was a pending sale on the residence at 36 Alexander, and the Arrospides did not want to jeopardize the sale by having another deed of trust "pop up" on the property. Nevertheless, Carboni recorded the deed of trust the same week it was executed.

When Jorge Sr. failed to make any payments on the note after demand, Carboni filed his complaint for judicial foreclosure and deficiency judgment on June 21, 1989. Jorge Sr. appeared at the court trial in propria persona. Following testimony from both sides, the trial court issued the following memorandum decision: "While in regard to short term loans of ninety days or so, as was anticipated here, interest at the rate of 200% per annum may or may not shock the conscience of the Court, interest at that rate for one and one-half years does. Accordingly, the Court finds that enforcement of the interest rate provisions of the notes herein involved for the time period involved is against public policy. The Court will allow interest on the principal sum at the rate of 24% per annum, to date."

The trial court entered judgment permitting interest at the rate of 24 percent per annum and foreclosing the property. After the trial court denied a motion to vacate the judgment, Carboni appealed.[1]

## II

### DISCUSSION[2]

A. *The Law of Unconscionability.*

The present case is controlled by Civil Code[3] section 1670.5,[4] which provides: "(a) If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court

---

[1]Jorge Sr. also filed a notice of cross-appeal and designation of clerk's and reporter's transcripts. However, Mr. Arrospide has taken no further action to prosecute the cross-appeal and we presume it has been abandoned.

[2]Respondent, who appears in propria persona in this appeal, has not filed a brief in this action. Accordingly, rule 17(b) of the California Rules of Court is applicable to this appeal. "Courts have differed in the application of this rule with some taking a strict view and holding that the failure to file a brief was in effect a consent to a reversal [citation], or an abandonment of any attempt to support the judgment. [Citation.] Since the burden is always on the appellant to show error, other courts have taken the position that the failure to file a brief does not require an automatic reversal. [Citations.] The better rule and the one which we follow is to examine the record on the basis of appellant's brief and to reverse only if prejudicial error is found. [Citations.]" (*Votaw Precision Tool Co.* v. *Air Canada* (1976) 60 Cal.App.3d 52, 55 [131 Cal.Rptr. 335].)

[3]Unless otherwise indicated, all further statutory references are to the Civil Code.

[4]Because the loan in this case was made by a licensed real estate broker and was secured by real property it is exempt from California's usury laws. (§ 1916.1.)

may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result." In making this determination, the court should consider the commercial setting, purpose, and effect of the contract. (§ 1670.5, subd. (b).)

■ Section 1670.5 was enacted in 1979. (Stats. 1979, ch. 819, § 3, p. 2827.) Before that time, however, California courts long recognized "unconscionability" as a viable common law doctrine even in the absence of specific statutory authority. (*A & M Produce Co.* v. *FMC Corp.* (1982) 135 Cal.App.3d 473, 484 [186 Cal.Rptr. 114] (*A & M Produce*); *Perdue* v. *Crocker National Bank* (1985) 38 Cal.3d 913, 925 [216 Cal.Rptr. 345, 702 P.2d 503].) Moreover, section 1670.5 was adopted verbatim from section 2-302 of the Uniform Commercial Code; however, section 1670.5 expanded its coverage to include all contracts. (*A & M Produce, supra,* 135 Cal.App.3d at pp. 484-485; *Perdue* v. *Crocker National Bank, supra,* 38 Cal.3d at p. 925, fn. 10.) Thus, in interpreting section 1670.5, we may look to cases analyzing section 2-302 of the Uniform Commercial Code and to the common law.

■ Surprisingly, the parties have not cited, and we have not discovered, any case which applies the doctrine of unconscionability to specifically annul or reform a loan which bears a shockingly high rate of interest.[5] Although one respected commentator has suggested this would be a proper

---

[5]One California case of fairly recent vintage addressed a claim that an interest rate was unconscionably high. In *Peoples Finance etc. Co.* v. *Mike-Ron Corp.* (1965) 236 Cal.App.2d 897 [46 Cal.Rptr. 497] the court concluded that it was required to enforce an interest rate provision even though it believed the interest charged was unconscionably high. (*Id.,* at pp. 902-903.) In effect, the opinion suggests that interest rates are exempt from the unconscionability doctrine. We believe *Peoples Finance* was wrongly decided on this point.

To support its conclusion, *Peoples Finance* cited an ancient Supreme Court case—*Boyce* v. *Fisk* (1895) 110 Cal. 107 [42 P. 473]. *Boyce* was decided at a time when California had no laws against usury, and when section 1918 provided that " 'parties may agree in any contract in writing for the payment of any rate of interest, and it shall be allowed, according to the terms of the agreement, until entry of judgment.' " (*Boyce, supra,* 110 Cal. at p. 112.) The defendant in *Boyce* claimed that the interest rate charged on a secured note—4 percent per month—was "manifestly unjust and oppressive" and that the court should reduce the amount of interest to the legal rate. (*Id.,* at pp. 109-111.) *Boyce* did *not* hold that interest rate provisions were exempt from the general rules of unconscionability. Instead, in that case the Supreme Court stated that the high interest rate *alone* was insufficient to annul the contract: "Courts of equity are as much bound by the laws of the land as courts of law, and neither may set aside or annul contracts, made in strict compliance therewith, with impunity. . . . [¶] No doubt the excess of interest is a circumstance which, coupled with others tending to show actual fraud, or such circumstances of oppression and overreaching as warrant the inference of undue advantage, is sufficient cause for setting aside a contract. But without some such showing a court of equity may not disregard the contract which the parties have deliberately made, and make a new one for them." (*Id.,* at p. 112.)

*Boyce* was decided before the rules regarding unconscionability had fully formed in California, and, of course, before the enactment of Civil Code section 1670.5. We can see no

application of the unconscionability doctrine,[6] it appears it has rarely, if ever, been applied in this context. Nevertheless, we believe we may look to cases finding unconscionability on the basis of gross price disparity as analogous authority. In essence, the interest rate is the "price" of the money lent; at some point the price becomes so extreme that it is unconscionable.[7]

Although it is a simple matter to say that at some point an interest rate becomes unconscionable, it is more difficult to determine when that point is reached. Professor Williston has explained that unconscionability ". . . is an amorphous concept obviously designed to establish a broad business ethic. . . . ▆▆▆ [¶] The concept of unconscionability was meant to counteract two generic forms of abuses, the coincidence of both forms being necessary to a finding of the concept's applicability. [¶] The first type of abuse relates to procedural deficiencies in the contract formation process, taking the form either of deception or a refusal to bargain over contract terms. [¶] The second type of abuse involves the substantive contract terms themselves and may be analyzed according to four specific sub-categories of abuses including: . . . 4. [¶] Unexpectedly harsh terms manifested in the form of price disparity." (15 Williston on Contracts (3d ed. 1972) § 1763A, pp. 213-215, fn. omitted, quoted in *Truta* v. *Avis Rent A Car System, Inc.* (1987) 193 Cal.App.3d 802, 819 [238 Cal.Rptr. 806].)

The leading California case on unconscionability generally follows Professor Williston's analysis of the issue. In *A & M Produce, supra,* 135 Cal.App.3d 473 the court recognized that unconscionability has both a "procedural" and a "substantive" aspect. (*Id.,* at p. 486.) The procedural aspect is manifested by (1) "oppression," which refers to an inequality of bargaining power resulting in no meaningful choice for the weaker party, or

---

reason why interest rate provisions should be exempt from the general rules of unconscionability, especially in light of section 1670.5 which applies to *all* contracts. (*A & M Produce, supra,* 135 Cal.App.3d at p. 485; *Perdue* v. *Crocker National Bank, supra,* 38 Cal.3d at p. 925, fn. 10.) The suggestion to the contrary in the *Peoples Finance* case is simply wrong.

[6]In his discussion of the common law doctrine of unconscionability, Professor Corbin states: "Agreements for the exchange of different currencies *or for the loan of a sum of money at a high rate of interest* may be so extreme as to appear unconscionable according to the mores and business practices of the time and place." (1 Corbin, Contracts (1963) § 128, p. 551, italics added.)

[7]As Professor Corbin explains: "In an ordinary contract for a loan of money, the debtor promises to repay a sum larger than the amount advanced; but the repayment is to be made at a later date and the difference is interest for the use of the money lent. The value of this use is as much a matter for the agreement of the parties as is the value of a chattel. Therefore, in the absence of a usury statute, a contract that requires the payment of a very high rate of interest will be enforced, *up to the point at which 'unconscionability' becomes an operative factor.*" (1 Corbin, Contracts, *supra,* § 129, p. 556, italics added, fn. omitted.)

(2) "surprise," which occurs when the supposedly agreed-upon terms are hidden in a prolix document. (*Ibid.*)

"Substantive" unconscionability, on the other hand, refers to an overly harsh allocation of risks or costs which is not justified by the circumstances under which the contract was made. (*A & M Produce, supra,* 135 Cal.App.3d at p. 487.) Presumably, both procedural and substantive unconscionability must be present before a contract or clause will be held unenforceable. However, there is a sliding scale relationship between the two concepts: the greater the degree of substantive unconscionability, the less the degree of procedural unconscionability that is required to annul the contract or clause. (*Ibid.; West v. Henderson* (1991) 227 Cal.App.3d 1578, 1587-1589 [278 Cal.Rptr. 570]; *Dean Witter Reynolds, Inc. v. Superior Court* (1989) 211 Cal.App.3d 758, 768 [259 Cal.Rptr. 789].)[8]

B. *Analysis.*

With these general principles in mind, we must now determine whether the trial court correctly concluded that the interest rate provision was unconscionable. ■ Although unconscionability is ultimately a question of law, numerous factual inquiries bear upon that question. "To the extent there are conflicts in the evidence or in the factual inferences which may be drawn therefrom, we must assume a set of facts consistent with the court's finding of unconscionability if such an assumption is supported by substantial evidence." (*A & M Produce, supra,* 135 Cal.App.3d at p. 489.)

1) *Substantive Unconscionability.*

■ We have little trouble concluding that an interest rate of 200 percent on a secured $99,000 loan is substantively unconscionable; i.e., that it imposes a cost on the borrower which is overly harsh and was not justified by the circumstances in which the contract was made. (*Dean Witter Reynolds, Inc. v. Superior Court, supra,* 211 Cal.App.3d at p. 768.) However,

---

[8]Numerous California decisions have followed the *A & M Produce* approach to analyzing unconscionability. (See, e.g., *West v. Henderson, supra,* 227 Cal.App.3d at p. 1586; *Dean Witter Reynolds, Inc. v. Superior Court, supra,* 211 Cal.App.3d at pp. 767-768; *H. S. Perlin Co. v. Morse Signal Devices* (1989) 209 Cal.App.3d 1289, 1300-1301 [258 Cal.Rptr. 1]; *Truta v. Avis Rent A Car System, Inc., supra,* 193 Cal.App.3d at pp. 819-820; *Chretian v. Donald L. Bren Co.* (1984) 151 Cal.App.3d 385, 389 [198 Cal.Rptr. 523].)

Nevertheless, our Supreme Court has not fully embraced this analysis. Instead, in *Perdue v. Crocker National Bank, supra,* 38 Cal.3d at page 925, footnote 9, the court described the *A & M Produce* analysis as an "alternative analytical framework" to that offered by the Supreme Court in *Graham v. Scissor-Tail, Inc.* (1981) 28 Cal.3d 807 [171 Cal.Rptr. 604, 623 P.2d 165].

"deciding the issue is substantially easier than explaining it." (*Jones* v. *Star Credit Corp.* (1969) 59 Misc.2d 189 [298 N.Y.S.2d 264, 266].)

We note first that according to Carboni's own testimony, the interest rate (200 percent) was approximately 10 times the rate then prevailing in the credit market for similar loans.[9] Thus, the "price" of the credit was, by at least one objective measure, roughly ten times its value.[10] Courts have found sales contracts unconscionable where the price disparity was far less severe. For example, in *Jones* v. *Star Credit Corp.*, *supra*, 298 N.Y.S.2d 264, the court found the sale of a $300 freezer for $1,234.80 (including credit charges, insurance, and sales tax) unconscionable under Uniform Commercial Code section 2-302. (*Id.*, at pp. 265-267.) Similarly, in *Frostifresh Corporation* v. *Reynoso* (1966) 52 Misc.2d 26 [274 N.Y.S.2d 757] (revd. on other grounds in *Frostifresh Corporation* v. *Reynoso* (1967) 54 Misc.2d 119 [281 N.Y.S.2d 964, 965]), the court found the sale of a refrigerator for $900 plus credit charges of $245.88 unconscionable as a matter of law where the unit cost the seller only $348. In these cases the price of the commodities was only three to four times their true value. Here, it can be argued, the price of the credit was approximately *10 times* its true value.

Nevertheless, Carboni contends the high interest rate was not substantively unconscionable because it was justified by the circumstances of the transaction. Substantive unconscionability " 'turns not only on a "one sided" result, but also on an absence of "justification" for it.' " (*A & M Produce*, *supra*, 135 Cal.App.3d at p. 487; *Kurashige* v. *Indian Dunes, Inc.* (1988) 200 Cal.App.3d 606, 613-614 [246 Cal.Rptr. 310].) Carboni contends the high interest rate was justified because no other charges were made for the loan (such as points and documentation fees) and, if it had been paid off as scheduled, the loan would have actually been cheaper than the alternatives available to the Arrospides. Carboni's own testimony again undermines his argument. Carboni claimed the Arrospides could have obtained a $4,000 loan secured by a third deed of trust for 10 points ($400) at 18 to 21 percent interest (approximately $200 for 3 months) plus costs for document preparation, title insurance and "so forth." Thus the entire cost for a three-month "conventional" loan would have been $600 plus unspecified costs for document fees and title insurance. As it was, at 200 percent interest, Jorge Sr. would have paid *$2,000* to borrow $4,000 for three months. In these circumstances, we doubt whether the loan obtained was cheaper than more conventional financing.

---

[9]Carboni testified that if he could have placed a third deed of trust on the property, he would have charged 18 to 21 percent interest with a 10 percent broker's fee plus additional costs related to processing the loan.

[10]In determining whether a price term of a contract is unconscionable, courts may look to " 'the price actually being paid by . . . other similarly situated consumers in a similar transaction.' " (*Perdue* v. *Crocker National Bank*, *supra*, 38 Cal.3d at pp. 926-927.)

In any event, Carboni's argument ignores the fact that the principal amount of the note ballooned over the next four months to more than $99,000, and that the due date was extended (at least implicitly) beyond three months.[11] Carboni voluntarily transformed a $4,000 note into a $99,000 line of credit. His argument simply cannot justify a 200 percent rate on the amount ultimately borrowed ($99,000) for an unspecified term.

In a similar vein, Carboni argues the judgment must be reversed because the loan was not unconscionable "at the time it was made." (See § 1670.5, subd. (a).) In effect, Carboni is merely reiterating his previous argument that the 200 percent interest rate was justified by the circumstances of the transaction;[12] we reject this argument for the same reasons.

In sum, we conclude the 200 percent interest rate is substantively unconscionable.

2) *Procedural Unconscionability.*

We next consider whether there is evidence of procedural unconscionability in this case. We conclude there is.

Again, the procedural aspect of unconscionability refers to an absence of meaningful choice on the part of one of the parties which may be evidenced by (1) oppression, that is, an inequality of bargaining power resulting in an absence of meaningful choice; or (2) surprise, which occurs when the objectionable term is hidden in the document. (*A & M Produce, supra,* 135 Cal.App.3d at p. 486.)    Clearly, this case does not involve surprise; the interest rate was a bargained for term which was plainly set out in the "Regulation Z" disclosure statement signed by George Jr. Nevertheless, we believe there was an inequality of bargaining power which effectively robbed Jorge Sr. of any meaningful choice.

Viewing the evidence in the light most favorable to the judgment, we must presume Jorge Sr. was acting under emotional distress when he borrowed the

---

[11]Carboni continued to advance money on the note even after the original due date. The note was originally due on October 26, 1988. However, Carboni advanced $21,000 after that date.

[12]In *A & M Produce, supra,* 135 Cal.App.3d at page 487, the court stated that "[o]ne commentator has pointed out, however, that '. . . [substantive] unconscionability turns not only on a "one-sided" result, but also on an absence of "justification" for it.' [Citation], which is only to say that substantive unconscionability must be evaluated as of the time the contract was made. (See U. Com. Code, § 2-302.)"

funds to pay his parents' medical expenses. Most important, it appears Jorge Sr. had attempted unsuccessfully to secure a loan from other sources. The "Agreement" signed by the parties in connection with the loan states that "Owner acknowledges and agrees that Lender's charges for the loan are costly, but Owner has tried unsuccessfully to obtain a loan from other sources and now feels that making this loan is the best way for Owner to make the payments on his bills and obligations." Thus, it appears that Jorge Sr. had unequal bargaining power because he was unable to obtain a loan from other sources. Consequently, Carboni was able to offer him credit on a "take it or leave it" basis. This effectively deprived Jorge Sr. and his son of any meaningful choice, since they had no alternative for obtaining credit.

Nevertheless, Carboni claims there is no procedural unconscionability here because Jorge Sr. *did* have alternative sources of credit. In *Dean Witter Reynolds, Inc.* v. *Superior Court, supra,* 211 Cal.App.3d 758 the court held that "any claim of 'oppression' may be defeated if the complaining party had reasonably available alternative sources of supply from which to obtain the desired goods or services free of the terms claimed to be unconscionable. If 'oppression' refers to the 'absence of meaningful choice,' then the existence of a 'meaningful choice' to do business elsewhere must tend to defeat any claim of oppression." (*Id.,* at p. 768.) Whether or not we agree with this statement of law, it is not controlling in this case. Viewed in the light most favorable to the judgment, the evidence shows that Jorge Sr. did not have "reasonably available alternative sources" of credit. To the contrary, the loan "Agreement," which was prepared by Carboni, states that Jorge Sr. "has tried unsuccessfully to obtain a loan from other sources and now feels that making this loan is the best way for Owner to make the payments on his bills and obligations." Thus, Carboni's own contract defeats his claim that Jorge Sr. had a meaningful choice to do business elsewhere. In addition, Carboni testified that George Jr. told him it was impossible for him to borrow funds elsewhere because this was the fourth deed of trust on the property.

Finally, we note that even if the procedural aspect of unconscionability in this case was slight, the substantive unconscionability was severe. A compelling showing of substantive unconscionability may overcome a weaker showing of procedural unconscionability. (*West* v. *Henderson, supra,* 227 Cal.App.3d at p. 1588.)

The judgment is affirmed.

Merrill, J., and Chin, J., concurred.

A petition for a rehearing was denied January 21, 1992, and appellant's petition for review by the Supreme Court was denied March 19, 1992.